## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

**CIVIL ACTION NO. 4:21-CV-00054-JHM**

**POLYWEAVE PACKAGING, INC.**                                             **PLAINTIFF**

**V.**

**PETER PAUL MONTGOMERY BUTTIGIEG,**
**in his official capacity as Secretary of Transportation**               **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction [DN 6] and Defendant's Motion to Dismiss.  [DN 17].  Fully briefed, this matter is ripe for decision.  For the following reasons, Defendant's Motion to Dismiss is **GRANTED**. Plaintiff's Motion for Preliminary Injunction is **DENIED**.

### I. BACKGROUND

This case concerns the lawfulness of the Secretary of Transportation's rescission of 49 C.F.R. §§ 5.53–5.111 from the Code of Federal Regulations.

#### A. Polyweave's Enforcement Action

Polyweave Packaging, the plaintiff in this case, is a hazardous materials packaging company in Madisonville, Kentucky. [DN 1 ¶ 23]. It is regulated by the Pipeline & Hazardous Materials Safety Administration ("PHMSA"), a subdivision of the Department of Transportation ("DOT"). [*Id*. at ¶ 45]. PHMSA initiated a regulatory enforcement action against Polyweave in April 2015. [*Id*. at ¶¶ 23, 46]. After an investigation and administrative proceedings, PHMSA issued a final order assessing a significant civil penalty against Polyweave in July 2020. [*Id*. at ¶ 54]. Polyweave is currently appealing that decision through administrative channels. [*Id*. at ¶ 56].

**B. Subpart D**

In late 2019, the then-President of the United States issued Executive Order 13892. [*Id*. at ¶ 7]. The Executive Order outlined transparency and due process guidelines for federal agency enforcement actions. *See* Exec. Order 13892, 84 Fed. Reg. 55239 (Oct. 9, 2019). As relevant here, it required "each agency that conducts civil administrative inspections" to publish rules of agency procedure within 120 days and follow those rules in subsequent enforcement actions. 84 Fed. Reg. at 55241.

The Transportation Secretary ("Secretary"), complying with the executive order, published DOT's rules of agency procedure later in the year. [DN 1 ¶ 10]; *see* 84 Fed. Reg. 71714 (Dec. 27, 2019). The published rules had four parts. The fourth part, title "Subpart D," is at issue here. Subpart D was titled "Enforcement Procedures." 84 Fed. Reg. at 71718. It listed thirty rules of DOT enforcement procedure. The rules lay out DOT enforcement policies, 49 C.F.R. § 5.59 (rescinded), explain how DOT will initiate investigations, *id*. at §§ 5.61 (rescinded), 5.63 (rescinded), and provide guidelines for DOT personnel in managing settlements, *id*. at §§ 5.93 (rescinded), 5.95 (rescinded). The purpose for Subpart D, according to the Secretary, was to "clarify the procedural requirements governing enforcement actions initiated by DOT . . . ." 84 Fed. Reg. at 71715. DOT had already adopted the procedures at the time of publication. *Id*. at 71716 (stating that the rule "describes the Department's *existing internal procedures*" and that the "Department *has adopted* these internal procedures as part of its regulatory reform initiative") (emphasis added). Yet the Secretary published the procedures to comply with the executive order. *Id*.

The Secretary did not engage in notice-and-comment rulemaking before publishing Subpart D. The Secretary stated notice-and-comment rulemaking was unnecessary because "[t]his

2

final rule merely incorporates existing internal procedures applicable to the Department's administrative procedures." *Id*. at 71716.

On January 20, 2021, the new President of the United States revoked Executive Order 13892 through a new executive order. [DN 1 at ¶ 15]; *see* Exec. Order 13992, 86 Fed. Reg. 7049 (Jan. 20, 2021). The new executive order commanded agencies to "promptly take steps to rescind any order, rules, regulations, guidelines, or policies . . . implementing or enforcing" the prior executive order. 86 Fed. Reg. at 7049.

In response to the new executive order, the Secretary rescinded Subpart D in its entirety. The Secretary determined that "[m]any of the policies and procedures" in Subpart D "were prompted by executive orders that have since been revoked." 86 Fed Reg. 17292, 17292 (Apr. 2, 2021). The Secretary decided to rescind the remaining policies because they were "duplicative of existing procedures contained in internal departmental procedural directives," and did not need to be published in the Code of Federal Regulations to be effective. *Id*. at 17293. He rescinded Subpart D without notice-and-comment rulemaking. That rescission gives rise to this litigation.

## C. This Litigation

Soon after the Secretary rescinded Subpart D, Polyweave sued to reinstate it. It asserts the Secretary unlawfully rescinded Subpart D for three reasons. Substantively, Polyweave claims the rescission was (a) was arbitrary and capricious because it failed to explain several important limits, *see* 5 U.S.C. § 706(2)(A), and (b) failed to consider Polyweave's reliance interest. [DN 1 ¶ 64(b)– (j)]. Procedurally, Polyweave maintains the Secretary needed to, but did not, engage in notice-and-comment rulemaking. [*Id*. at ¶ 64(a)]. The gist of Polyweave's allegations is that Subpart D, despite its label as a rule of agency procedure, provided several substantive rights to companies targeted in DOT enforcement proceedings. Polyweave believes the Secretary erred

3

when he failed to account for, explain, or justify the rescission of those substantive rights in the final rule rescinding Subpart D.

49 C.F.R. § 5.83 is the primary "substantive" right Polyweave relies on as its source of harm. When effective, § 5.83 stated:

> It is the Department's policy that each responsible OA or component of OST will voluntarily follow in its civil enforcement actions the principle articulated in Brady v. Maryland, in which the Supreme Court held that the Due Process Clause of the Fifth Amendment requires disclosure of exculpatory evidence 'material to guilt or punishment' known to the government but unknown to the defendant in criminal cases. Adopting the 'Brady rule' and making affirmative disclosures of exculpatory evidence in all enforcement actions will contribute to the Department's goal of open and fair investigations and administrative enforcement proceedings. This policy requires the agency's adversarial personnel to disclose materially exculpatory evidence in the agency's possession to the representatives of the regulated entity whose conduct is the subject of the enforcement action. These affirmative disclosures should include any material evidence known to the Department's adversarial personnel that may be favorable to the regulated entity in the enforcement action—including evidence that tends to negate or diminish the party's responsibility for a violation or that could be relied upon to reduce the potential fine or other penalties. The regulated entity need not request such favorable information; it should be disclosed as a matter of course. Agency counsel should recommend appropriate remedies to DOT decision makers where a Brady rule violation has occurred, using the factors identified by courts when applying the Brady rule in the criminal context.

Although Polyweave devotes much of its argument to the "substantive" rights provided in § 5.83, its Complaint lists a host of additional "substantive" rights in various C.F.R. provisions; rights that the Secretary allegedly unlawfully rescinded when he rescinded those provisions. [DN 1 ¶ 33].

Polyweave's Complaint seeks an injunction against the Secretary's rescission of Subpart D and a declaratory judgment that the Secretary could not lawfully rescind the substantive protections provided in its regulations. [*Id*. at ¶¶ 62–81]. Polyweave immediately moved for a preliminary injunction. [DN 6].

The Secretary responded to Polyweave's Complaint and motion for preliminary injunction by filing a competing motion to dismiss. [*See* DN 17]. The Secretary claims a host of jurisdictional

4

defects prevent the Court from addressing the merits of Polyweave's claims: (1) Polyweave lacks Article III standing, (2) the Court of Appeals has exclusive jurisdiction, and (3) Subpart D's rescission is a matter of unreviewable agency discretion. Because the jurisdictional questions are a prerequisite to the Court reaching the substance of Polyweave's motion for a preliminary injunction, the Court will address the motion to dismiss first.

## II. MOTION TO DISMISS

The Secretary asserts the Court must dismiss this case for three reasons: (1) Polyweave lacks standing, (2) this Court lacks subject matter jurisdiction, and (3) the Secretary's action is an unreviewable decision outside the scope of the Administrative Procedure Act ("APA"). The Court need only address the Secretary's first argument to resolve this case.

### A. Standing

Article III of the Constitution extends the judicial power to all "cases" and "controversies." U.S. CONST. Art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Article III standing requires a plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct. at 2203. As the party invoking federal jurisdiction, Polyweave bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The Secretary mainly argues that Polyweave fails the first standing requirement: no injury-in-fact. An injury-in-fact must be concrete: "that is, real, and not abstract." *TransUnion*, 141 S. Ct. at 2204 (quotation omitted). It must also be "actual or imminent, not conjectural or

hypothetical." *Lujan*, 504 U.S. at 560. Tangible injuries are the most common injury-in-fact: personal, property, or financial injuries all qualify as tangible injuries-in-fact. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020) (recognizing the traditional concrete injuries are "tangible economic or physical harms"). But an intangible injury may be concrete if it "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). These precedents delineate two ways for a plaintiff to establish standing: (1) "the procedural harm itself is a concrete injury of the sort traditionally recognized" or (2) "the procedural violations caused an independent concrete injury." *Ward v. Nat'l Patient Acct. Servs.*, _ F.4th _, 2021 WL 3616067, at *3 (6th Cir. 2021). Polyweave attempts to establish standing both through procedural harms and independent injuries.

### i.   Procedural Harm: Rescission of 49 C.F.R. § 5.83

Polyweave's first argument is that the Secretary's rescission of § 5.83 alone constituted an intangible injury-in-fact, relieving Polyweave of the need to show an independent injury. [DN 27 at 7–12]. When effective, § 5.83 provided that "[i]t is the Department's policy that each responsible [unit] will voluntarily follow in its civil enforcement actions the principle articulated in Brady v. Maryland . . . ." 49 C.F.R. § 5.83 (rescinded). Polyweave asserts that, when the Secretary rescinded this regulation, he deprived Polyweave of its *Brady* right"—the right to exculpatory evidence. Deprivation of that right alone, Polyweave claims, is a cognizable injury-in-fact.

Deprivation of a right, untethered from any tangible injury, rarely constitutes an injury-in-fact establishing Article III standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing."). One exception to this rule is

constitutional injuries: the deprivation of a constitutional right, standing alone, can establish an Article III injury-in-fact. *See Spokeo*, 136 S. Ct. at 1549 (citing *Pleasant Grove City v. Sunnum*, 555 U.S. 460 (2009), which recognized Article III standing based on a First Amendment free speech violation, for the principle that "intangible injuries can nevertheless be concrete").

The issue for Polyweave is that there is no constitutional right to exculpatory evidence in a regulatory enforcement proceeding. Although Polyweave attempts to analogize its right to the due process rights recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), that comparison is unavailing. *Brady* recognized only a due process right to exculpatory information in criminal cases: it held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id*. at 87. Courts rarely have extended that due process right to civil cases, and have only done so in cases where "a person's liberty is at stake." *Brodie v. Dep't of Health & Human Servs*., 951 F. Supp. 2d 108, 118 (D.D.C. 2013); *see Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993) (applying *Brady* rights in an extradition case against a Nazi war criminal who faced the death penalty in the country of extradition). Courts have never extended that right in proceedings akin to this. *See, e.g*., *Fox ex rel. Fox v. Elk Run Coal Co*., 739 F.3d 131, 138–39 (4th Cir. 2014) ("We see no reason to expand *Brady* to this administrative adjudication."); *Brodie*, 951 F. Supp. 2d 108, 119 (D.D.C. 2013) ("*Brady* does not apply in the context of administrative hearings." (quotation omitted)); *In re Extradition of Drayer*, 190 F.3d 410, 414 (6th Cir. 1999) (stating that *Demjanjuk*, the one Sixth Circuit case extending *Brady* rights to an extradition case, involved "an unusual set of circumstances" and cautioned against extending it). There is no constitutional right to exculpatory information in a regulatory enforcement proceeding.

There is a second exception to the general rule that Article III injuries require deprivation of a right and a corresponding tangible injury: a procedural right granted by statute with a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. Polyweave tries without success to hitch its wagon to this route. It correctly notes that a constitutional harm "has traditionally been regarded as providing a basis for a lawsuit." *Id*. But it cites no statutory procedural right allowing the Court to loosen constitutional strictures and recognize an injury based on a "close relationship" to a constitutional harm. Supreme Court precedent confirms a statutory procedural right is critical. In *Spokeo*, *TransUnion*, and *Lujan*, the Supreme Court considered whether injuries existed when Congress authorized procedural rights of action for certain statutory violations. Although all three decisions held standing lacking, they nonetheless recognized that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in the judgment); *see Spokeo*, 136 S. Ct. at 1549 (quoting Justice Kennedy's concurrence); *TransUnion*, 141 S. Ct. at 2205. Congressional authorization was not *sufficient* to confer Article III standing in those cases, but the cases establish that congressional authorization is a *necessary* predicate for a court to recognize an intangible injury that did not exist under the Constitution or common law. *See Spokeo*, 136 S. Ct. at 1549 ("In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles.").

Lower court decisions confirm this result. Federal law can provide the necessary procedural foundation for an intangible injury-in-fact. *See Garland v. Orlans, PC*, 999 F.3d 432, 437 (6th Cir. 2021) (statutory right created by the FDCPA); *Farrell v. Blinken*, 4 F.4th 124, 129–35 (D.C. Cir. 2021) (statutory right created by the INA). So can state law. *See Maddox v. Bank of New York*

8

*Mellon Trust Co.*, 997 F.3d 436, 446–49 (2d Cir. 2021). But no precedent indicates that lower courts can create intangible injuries out of wholecloth. *See TransUnion*, 141 S. Ct. at 2204 (stating that any expansions beyond the traditionally recognized categories of Article III standing must be tightly capped, lest courts "loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts"). Absent statutory authorization, there is no basis for a court to stray beyond the traditionally recognized categories of harms.

Here, Congress has not "define[d] [an] injury" or "articulate[d] [a] chain of causation" tying *Brady* rights in criminal cases to *Brady* rights in regulatory enforcement proceedings. *See Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in the judgment). Absent this statutory connection, Polyweave lacks a cognizable Article III injury.

### ii.   Procedural Harm: Rescission of 49 C.F.R. § 5.65

Polyweave also claims the rescission of 49 C.F.R. § 5.65 constitutes an intangible injury sufficient to establish an injury-in-fact. [DN 27 at 16]. That provision, when it was effective, stated that "in exercising discretion to initiate an enforcement action and in the pursuit of that action, agency counsel must not adopt or rely upon overly broad or unduly expansive interpretations of the governing statutes or regulations, and should ensure that the law is interpreted and applied according to its text." 49 C.F.R. § 5.65 (rescinded).

Polyweave asserts this regulation protected constitutional fair notice principles. *See General Elec. Co. v. E.P.A.*, 53 F.3d 1324, 1328 (D.C. Cir. 1995) ("Due process requires that parties receive fair notice before being deprived of property."). Without it, Polyweave asserts, DOT will resume reliance on *Chevron* deference, *Auer* deference, and other standards of judicial deference to agency actions, with the end result being a violation of Polyweave's constitutional right to fair notice. [DN 27 at 16]. To clarify, Polyweave does not claim the Secretary's rescission

itself violated constitutional fair notice principles. *Cf. F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012) (rejecting an FCC fine against two broadcasting networks because the FCC's changing interpretation of a federal statute "failed to provide a person of ordinary intelligence fair notice of what is prohibited" (quotation omitted)). Instead, Polyweave's argument is that Subpart D *protected* fair notice, and its rescission allows DOT to violate fair notice *in the future*.

Polyweave's reasoning has several problems. But the most fundamental problem is that, with or without § 5.65, constitutional fair notice principles continue to apply in agency proceedings. Federal agencies cannot violate constitutional due process protections, whether agency regulations enumerate those protections or not. *See Fox Television*, 567 U.S. at 254. If judicial deference to an agency interpretation means that the agency would violate constitutional fair notice, that agency interpretation receives no deference. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (declining to apply *Auer* deference when that deference would "seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires." (cleaned up)). Thus, the Due Process Clause protects Polyweave in its regulatory enforcement proceeding with PHMSA, with or without Subpart D.

A second fundamental problem with Polyweave's reasoning is that federal courts cannot exert jurisdiction based on a plaintiff's fear of future constitutional violations. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (rejecting Article III standing when plaintiffs relied on a "highly speculative fear" that the government would violate certain rights in the future). Polyweave boldly claims that "this entire case is about the rescission of rights and protection needed to ensure due process."[1] [DN 27 at 31]. But courts cannot abstractly decide whether a

---

[1] Part of Polyweave's "due process" argument centers around a memorandum written by DOT's General Counsel in early 2019. [*See* DN 1-2]. The memorandum outlines DOT enforcement procedures, many of which ultimately became

regulation is necessary to protect due process. Courts decide only "cases and controversies" prescribed by Article III. U.S. Const. Art. III, § 2. The case or controversy requirement necessitates that Polyweave come to court with an explicit due process violation or a likelihood that such a violation is certainly impending. *See Amnesty Int'l*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact . . . ." (cleaned up)). It cannot run to court simply because it fears the rescission of regulations *will lead to* due process violations. The fear must come to fruition for Article III to confer a federal court with jurisdiction.

Polyweave cannot establish a constitutional injury sufficient to confer standing.

### iii.    Tangible Injuries

Polyweave next attempts to establish an injury-in-fact, and thus Article III standing, by alleging several tangible "injuries" it suffered from the Secretary's repeal of Subpart D. None are sufficient to establish standing.

### 1. "Informational injury" from § 5.83's rescission

Polyweave's first "tangible" injury, like its first asserted procedural injury above, derives from the Secretary's rescission of 49 C.F.R. § 5.83—the regulation requiring disclosure of exculpatory information. Although the Secretary's rescission of § 5.83 alone was not a cognizable injury, Polyweave argues PHMSA is now withholding exculpatory evidence in its regulatory enforcement proceeding, so Polyweave suffered an independent concrete injury. [DN 27 at 12–

---

part of Subpart D. According to Polyweave, this memorandum is important because, in the introduction, it states that "[t]he purpose of this memorandum is to ensure that DOT enforcement actions satisfy principles of due process . . . ." [*Id*. at 1]. Thus, Polyweave asserts that, by DOT's own logic, "rescinding [Subpart D's] rights necessarily results in enforcement actions that lack adequate due process." [DN 27 at 31–32].

The Court does not follow Polyweave's chain of inference. For one, the memorandum only outlined internal agency procedure—rescinding regulations publishing that procedure does not mean the procedure disappeared. For another, an agency's interpretation about what is necessary to protect due process does not bind the Court. Finally, the absence of the positive (rescinding regulations that provide certain protections) does not prove the negative (those protections are eviscerated).

14]. This alleged "informational injury" from withholding information, if established, is certainly enough to establish a concrete injury for Article III. *See Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 766 (D.C. Cir. 2020) (en banc) ("[T]he denial of information to which the plaintiff claims to be entitled by law establishes a quintessential injury in fact."). But Polyweave runs into two insurmountable barriers.

First, Polyweave did not plead that PHMSA is withholding exculpatory evidence. Polyweave's Complaint states only that it "requested that PHMSA disclose exculpatory evidence." [DN 1 ¶ 56]. It does not assert that PHMSA *withheld* such exculpatory evidence. Those allegations arise for the first time in its response brief. [DN 27 at 12–14].

Second, even if the Court could consider Polyweave's response-brief allegations,[2] those allegations do not sufficiently allege an Article III injury. Were Polyweave to file a supplemental pleading to include the new allegations, the Court would consider it under the same standard as a Rule 15(a) motion for leave to amend. *Spies v. Voinovich*, 48 F. App'x 520, 527 (6th Cir. 2002). One element in a Rule 15(a) inquiry is futility—whether the amendment can survive a motion to dismiss. *See Rose v. Hartford Underwriters Ins. Co.*, 204 F.3d 417, 420 (6th Cir. 2000). The allegations before the Court[3] do not indicate Polyweave could, consistent with Rule 11(b)(3), plead facts alleging PHMSA continues to withhold exculpatory evidence. *See* Fed. R. Civ. P. 11(b)(3).

---

[2] Many of the facts underpinning Polyweave's new allegations of exculpatory evidence withholding occurred after Polyweave filed its Complaint. [*See* DN 24 (Government notice of additional disclosure)]. The proper avenue to allege these new facts, however, is in a supplemental pleading. *See* Fed. R. Civ. P. 15(d); *see also Sunless, Inc. v. Selby Holdings, LLC*, No. 3:20-cv-930, 2021 WL 3513871, at *2 (M.D. Tenn. Aug. 10, 2021) ("[W]hen a party wishes to plead facts about 'any transaction, occurrence, or event that happened after the date of the' initial pleading, that party should rely on a supplemental pleading pursuant to Rule 15(d) . . . ." (emphasis omitted) (quoting Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1504)). Without a supplemental pleading, "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. F.E.C.*, 554 U.S. 724, 734 (2008).

[3] The Court considered two parts of the record in determining what facts Polyweave could plead: (a) Polyweave's assertions in its response brief [DN 27] and (b) an email exchange about discovery of evidence between Polyweave and PHMSA. [DN 24-1]. The Court likely could not consider the email exchange on a motion to dismiss, but the emails are relevant when considering what facts Polyweave could plead in a supplemental pleading.

Polyweave's allegations instead amount to mere speculation that PHMSA continues to withhold exculpatory information.

An email chain between the parties outlines the facts most relevant to Polyweave's new allegations: Polyweave requested exculpatory evidence from PHMSA in May, after Subpart D's rescission; PHMSA turned over the entire casefile. [DN 24-1 (emails outlining the parties' exchanges)]. In June, Polyweave sought additional information not included in the casefile: specifically, inspector photographs from customer site visits. PHMSA located the photographs and, based on a "global search of PHMSA's case management system," found a few other files involving Polyweave's case. PHMSA sent those documents to Polyweave. [*Id.*].

Polyweave uses this exchange as evidence PHMSA withheld exculpatory information. But that argument crumbles on multiple fronts. First off, it is not clear whether the additional documents produced are exculpatory. *Compare* [DN 27 at 8 ("Polyweave believes" the additional evidence "is exculpatory")], *with* [DN 28 at 9 ("PHMSA has already rejected" the claim that the documents are exculpatory)]. Second, even if the documents are exculpatory (as the Court would assume in an amended complaint), it brings Polyweave no closer to establishing standing. "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974)) (brackets omitted). Polyweave seeks only injunctive and declaratory relief; it does not seek damages. Thus, past harm from nondisclosure of exculpatory evidence does not suffice— Polyweave must allege PHMSA continues to withhold exculpatory evidence today. *See Hange v. City of Mansfield*, 257 F. App'x 887, 892 (6th Cir. 2007) ("Since he cannot show a likelihood of future or continuing injury, Hange . . . lacks standing to pursue injunctive and declaratory relief.").

13

Polyweave's reply brief vaguely attempts to assert that PHMSA continues to withhold exculpatory evidence—it argues that "Polyweave is entitled to the inference that Defendant's continued refusal to provide assurances [that all exculpatory material has been turned over] indicates that additional *Brady* material is being withheld." [DN 27 at 15]. Notably lacking, however, are any *factual* allegations allowing the Court to draw that "inference." Instead, the facts before the Court suggest the exact opposite: (1) PHMSA turned over its entire casefile to Polyweave twice, (2) Polyweave sought specific documents not in the casefile, (3) PHMSA found those documents, produced them to Polyweave, and also found other (unrequested) documents that it voluntarily turned over.[4] [DN 24-1]. Polyweave broadly claims these documents are exculpatory. But even so, the disclosure of exculpatory information does not indicate PHMSA continues to withhold exculpatory information. The Secretary asserts PHMSA has turned over every relevant document in its system. [DN 17 at 7 ("[T]he evidence incorporated by reference in the Complaint conclusively refutes any allegation that PHMSA is withholding exculpatory evidence.")]. Polyweave provides no factual allegations to refute that. Its assertions about material evidence being withheld is mere speculation, and speculation is not an Article III injury. *See, e.g.*, *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1031 (8th Cir. 2014) ("Time and again the Supreme Court has reminded lower courts that speculation and conjecture are not injuries cognizable under Article III.").

Underscoring this conclusion is the fact that Subpart D's exculpatory evidence disclosure requirement was effective for fifteen months of Polyweave's regulatory enforcement proceeding. The Secretary promulgated Subpart D in December 2019, years after Polyweave's enforcement

---

[4] Polyweave also asks the Court to draw an adverse inference from the fact that, in the week between PHMSA's email "promising" to turn over photographs and Polyweave's response brief, PHMSA had not provided the photographs. [DN 27 at 13]. The Court declines to assume nefarious actions based on a one-week delay in providing the photographs.

proceedings started and six months before Polyweave received its final order of violation. [DN 1 ¶¶ 23, 28, 54]. So, Subpart D's exculpatory information requirement was effective *during* Polyweave's enforcement proceeding. It remained effective through the final order of violation, and was repealed only recently, while Polyweave was in the appeal process. For the fifteen months Subpart D was effective, PHMSA needed to provide exculpatory evidence as a matter of course. *See* 49 C.F.R. § 5.83 (rescinded). So, PHMSA needed to disclose all exculpatory documents through April 2021 to Polyweave. But the documents Polyweave claims are "exculpatory" documents are from early in the enforcement proceeding, well before Subpart D was promulgated. [DN 27 at 13–14 (describing allegedly withheld documents from 2015)]. Thus, Polyweave's claim that PHMSA *continues* to withhold exculpatory evidence assumes that PHMSA *violated* Subpart D while it was effective and continued to violate it when Polyweave requested additional materials. Polyweave asserts no facts allowing the Court to draw that conclusion.[5]

Further, Polyweave cannot establish redressability for its "informational injury." Although the parties address redressability only in passing, the Court has an independent obligation to consider it. *Summers v. Earth Island Inst*., 555 U.S. 488, 499 (2009) (stating that courts have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties.").

The only way reinstatement of Subpart D would redress Polyweave's "informational injury" is if PHMSA turned over exculpatory information. But Subpart D was effective for fifteen months of Polyweave's enforcement proceeding and PHMSA turned over no exculpatory information. The appeals process started before Subpart D was repealed, so there is presumably no new evidence in the case. *See Babbitt v. Wilkie*, No. EA-5565 2011 WL 167472, at *2 (N.T.S.B.

---

[5] If Polyweave believes PHMSA wrongfully withheld exculpatory evidence while Subpart D was effective, it must raise that claim in its administrative appeal.

Jan. 10, 2011) (NTSB administrative law judge stating that, in NTSB enforcement proceedings, "[w]e have long held that we will not, on appeal, entertain new evidence").

It is also unclear whether Subpart D's rescission actually changed any of DOT's disclosure obligations. As described below, *see* Section III.A.i, Subpart D merely published DOT's internal enforcement guidelines. The Secretary stated Subpart D was "duplicative of existing procedures contained in internal departmental procedural directives." 86 Fed. Reg. 17292, 17293 (Apr. 2, 2021). If DOT internal procedures still require disclosure of exculpatory information, there is no chance reinstating Subpart D would change anything. The Court would only be ordering publication of preexisting procedures. This uncertainty all makes it exceedingly unlikely that Subpart D's reinstatement would redress Polyweave's "informational injury." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (quotation omitted)).

To summarize, Polyweave has not alleged a concrete "informational injury" from nondisclosure of exculpatory evidence because its Complaint did not assert that PHMSA continues to withhold exculpatory evidence. And the Court is not inclined to grant leave to file a supplemental pleading based on the arguments in Polyweave's response brief: it does not appear Polyweave could, consistent with Rule 11(b)(3), assert PHMSA continues to withhold exculpatory evidence.

## 2. "Pocketbook injury" from § 5.83 & § 5.63's rescission

Polyweave lastly makes a fleeting attempt to assert a "pocketbook injury" from the Secretary's rescission of Subpart D's exculpatory evidence disclosure requirement. Polyweave pled that "Subpart D's rescission has improperly increased Polyweave's regulatory burden and raised the cost of defending itself against PHMSA," because it must expend "attorney fees and

16

costs" requesting materials it would have received as a matter of course under Subpart D. [DN 1 ¶ 61].

A financial harm, sometimes referred to as a pocketbook injury, is a "prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). The most common form of pocketbook injury involves taxpayers facing an increased tax burden. *See, e.g.*, *Smith v. Jefferson Cnty. Bd. of School Comm'rs*, 641 F.3d 197, 210 (6th Cir. 2011). But a pocketbook harm can also apply where, as here, an administrative action results in an increased regulatory or administrative burden. *See Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement."); *New York v. Scalia*, 464 F. Supp. 3d 528, 545 (S.D.N.Y. 2020) ("[T]he alleged burden associated with educating the public about a new administrative rule is enough to confer standing."); *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 126 (D.D.C. 2019) ("[T]he States have standing based on the Final Rule's direct imposition of an increased regulatory burden on them.").

Polyweave's "pocketbook injury" theory of standing, despite the limited discussion, comes closer than its prior arguments. It argues that "[i]t had to pay an hourly fee to its administrative-proceeding representative to repeatedly request evidence that PHMSA would have been required to affirmatively disclose 'as a matter of course' under § 5.83." [DN 27 at 14]. The Court acknowledges that having to pay a fee for information an entity previously received as a matter of course could be a cognizable injury. And though the allegations appear only in the response brief, the Court will accept (for purposes of this argument) Polyweave's allegations that the recently disclosed evidence is exculpatory. [*See* DN 27 at 8 n.3].

Even accepting all this as true, however, Polyweave still fails to establish Article III standing because it cannot show redressability. *See Lujan*, 504 U.S. at 561 (requiring it to be

"likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (quotation omitted)). Polyweave's "pocketbook injury" relies on costs it already incurred from paying an attorney to ask for exculpatory evidence. But its desired remedies are reinstatement of Subpart D and a declaratory judgment. This dichotomy between Polyweave's monetary injury and injunction-focused remedy is incompatible on both ends of the spectrum. On one end, the Court cannot redress already-incurred costs by reinstating Subpart D. *See AMG Capital Mgmt., LLC v. F.T.C.*, 141 S. Ct. 1341, 1347 (2021) ("An "injunction" is not the same as an award of equitable monetary relief."); *Mote v. City of Chelsea*, 391 F. Supp. 3d 720, 741 (E.D. Mich. 2019) ("For a plaintiff seeking injunctive or declaratory relief, the mere occurrence of past harm will not do."). On the other end, a preliminary injunction is available only when monetary harm is insufficient to redress Polyweave's harm. *See Prop. Mgmt. Connection, LLC v. Consumer Fin. Prot. Bureau*, No. 3:21-cv-359, 2021 WL 1946646, at *9 (M.D. Tenn. May 14, 2021) (injunction available only where monetary harm cannot redress plaintiff's injury).

In a final heave, Polyweave also asserts that DOT's rescission of 49 C.F.R. § 5.63 caused it a pocketbook injury. [DN 27 at 17]. Section 5.63, when effective, required DOT enforcement actions to "be founded on a grant of statutory authority" and required clear statutory authority to "impose monetary penalties." 49 C.F.R. § 5.63 (rescinded). Polyweave argues PHMSA would not have served the civil-penalty order if § 5.63 was effective because a statute sets a five-year window for commencing enforcement proceedings after a claim accrues, *see* 28 U.S.C. § 2462, overlooking its own complaint allegations that (1) PHMSA's claim accrued sometime in 2015, (2) PHMSA served a Notice of Probable Violation less than two years later, and (3) § 5.63 was effective when PHMSA served the civil-penalty order. [DN 1 ¶¶ 34, 47–48, 52–55]. Polyweave's own complaint flatly belies its argument that PHMSA would have acted any differently absent § 5.63's rescission.

18

Polyweave suffered no monetary injury traceable to § 5.63's rescission, and cannot establish standing on that basis.

***

The Court grants the Government's motion to dismiss because Polyweave lacks an Article III injury-in-fact. Polyweave suffered no constitutional injury that would abate its need to show individualized injury, nor can it establish an injury based on a "close relationship" to a constitutional harm without a statutory right of action. Polyweave also suffered no concrete injury that would provide it with Article III standing: Polyweave cannot show an informational injury related to exculpatory evidence because its Complaint did not assert that PHMSA continues to withhold exculpatory evidence, nor do its later-acquired facts suggest that it could assert such a claim consist with Rule 11(b)(3). Polyweave also cannot establish a pocketbook injury because an injunction or declaratory judgment cannot redress monetary harm.

## B.  Subject Matter Jurisdiction[6]

Because the Court concludes that Polyweave lacks standing to challenge the Secretary's rescission of Subpart D, it need not go further. Had Polyweave established standing, however, the Court would find that 49 U.S.C. § 5127(a) does not divest this Court of jurisdiction.

49 U.S.C. § 5127(a) provides that

> a person adversely affected or aggrieved by a final action of the Secretary under this chapter may petition for review of the final action in the United States Court of Appeals for the District of Columbia or in the court of appeals for the United States for the circuit in which the person resides or has its principal place of business.

The Secretary contends that Polyweave's challenge to Subpart D's rescission is actually a challenge to the procedural protections it received in its administrative enforcement proceeding.

---

[6] The Court considers the Secretary's second subject matter jurisdiction argument, whether Subpart D's rescission implicates an area "committed to agency discretion by law," below. *See* Section III.A.i.

19

[DN 17 at 9–13]. So, the Secretary continues, Polyweave must challenge Subpart D's rescission through a challenge to the final action in the Court of Appeals, not through a collateral challenge in District Court. But for two reasons, the Court does not believe Polyweave's complaint falls within the exclusive jurisdiction provisions of § 5127(a).

First, § 5127(a)'s statutory language does not apply to Polyweave's challenge. Section 5127(a) applies to a person "aggrieved by a final action of the Secretary *under this chapter*." (emphasis added). The "chapter" is Chapter 51 of the Title 49, which applies to enforcement actions for transportation of hazardous waste. *See* 49 U.S.C. § 5101, et seq. Chapter 51 presumably applies to PHMSA's underlying enforcement action against Polyweave, but it does not apply to the Secretary's rulemaking authority generally.

Second, the substance of Polyweave's challenge does not implicate the underlying enforcement action, either. The Secretary protests that, although the suit facially challenges Subpart D's rescission, "this suit is inescapably intertwined with Polyweave's ongoing administrative enforcement proceeding." [DN 28 at 14–15]. The Secretary correctly states the law: "statutes . . . that vest judicial review of administrative orders exclusively in the courts of appeals also preclude district courts from hearing claims that are 'inescapably intertwined' with review of such orders." *Mokdad v. Lynch*, 804 F.3d 807, 812 (6th Cir. 2015) (quoting *Merritt v. Shuttle, Inc*., 245 F.3d 182, 187 (2d Cir. 2001)). But the Court disagrees on the application of the law here. The Secretary conflates the *merits* of Polyweave's challenge with Polyweave's *standing* arguments. The merits of Polyweave's APA challenges are not "inescapably intertwined" with the enforcement proceeding. Its claims are that the Secretary's rescission of Subpart D was arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), and did not comply with notice-and-comment rulemaking requirements, *see* § 706(2)(D). None of these allegations require the Court to look to

the underlying administrative enforcement proceeding. In an effort to establish standing, however, Polyweave makes several allegations about the enforcement proceeding. These standing arguments do require discussion of the underlying enforcement proceeding. But the Court is aware of no precedent finding a case "inescapably intertwined," such that it divests a district court of jurisdiction, merely because the challenger's standing derived from an underlying administrative enforcement proceeding.

### III. MOTION FOR PRELIMINARY INJUNCTION

Alternatively, were the Court to reach the merits of Polyweave's motion, it would deny injunctive relief because Polyweave has not established a likelihood of success on the merits or irreparable harm.

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). A court considers four factors in determining whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019) (quoting *Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013)). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020) (quoting *Overstreet*, 305 F.3d at 573).

**A.  Likelihood of Success on the Merits**

Polyweave contends it will likely establish that the Secretary unlawfully rescinded Subpart D for three reasons, two substantive and one procedural. Substantively, Polyweave asserts Subpart D's rescission was arbitrary and capricious and failed to account for Polyweave's reliance interests. [DN 6-1 at 12–17]. Procedurally, Polyweave claims the Secretary needed to, but did not, engage in notice and comment rulemaking before rescinding the regulation. [*Id.* at 9–11]. The Court considers each argument in turn.

**i.    Review of Agency Substantive Decision: Arbitrary & Capricious Review**

The Secretary's rescission of Subpart D, Polyweave maintains, substantively violated the APA because it was arbitrary and capricious and failed to account for Polyweave's reliance interests. [DN 6-1 at 12–17]. The Secretary, however, suggests the Court cannot reach this question in the first place because Subpart D's rescission is committed to agency discretion by law, rendering it unreviewable in court. [DN 17 at 13–16]. The Court must first determine whether the agency action is reviewable in court before it can reach the merits of Polyweave's substantive APA challenges.

Courts review nearly all agency actions under the APA's arbitrary and capricious standard. 5 U.S.C. § 706(2)(A) (courts "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *Verizon Cal., Inc., v. F.C.C.*, 555 F.3d 270, 273 (D.C. Cir. 2009). The only agency actions not reviewable under the arbitrary and capricious standard are agency actions that fall outside the APA entirely. *See* 5 U.S.C. § 701(a). One type of action that falls outside the APA (and is thus unreviewable) is if "agency action is committed to agency discretion by law." § 701(a)(2).

The Supreme Court has recognized a "tension" between § 706(2)(A)'s requirement that courts set aside arbitrary and capricious agency action and § 701(a)(2)'s unreviewable actions— "[a] court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv*., 139 S. Ct. 361, 370 (2018). To alleviate this tension, courts read § 701(a)(2)'s exception "quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser*, 139 S. Ct. at 370 (quotation omitted). Courts usually apply this exception in areas "traditionally committed to agency discretion," including "the allocation of funds from a lump-sum appropriation," *id*. (citing *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)), "a decision not to reconsider a final action," *id*. (citing *I.C.C. v. Locomotive Eng'rs*, 482 U.S. 270, 282 (1987)), or a "decision not to institute enforcement proceedings," *Regents*, 140 S. Ct. at 1905 (citing *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)).

The Court believes the Secretary's rescission of Subpart D falls within the narrow exception for claims committed to agency discretion, rendering it an unreviewable act. The Court draws this conclusion for two reasons. One reason is that there is "no meaningful standard against which to judge the agency's exercise of discretion" here. *See Weyerhaeuser*, 139 S. Ct. at 370. The Secretary both promulgated and rescinded Subpart D pursuant to 49 U.S.C. § 322(a). *See* Initial Rulemaking, 84 Fed. Reg. 71714, 71718 (Dec. 27, 2019); Rescinded Rulemaking, 86 Fed. Reg. 17292, 17294 (Apr. 2, 2021). Section 322(a) states that "The Secretary of Transportation may prescribe regulations to carry out the duties and powers of the Secretary." The language is absolute: the Secretary "may" prescribe regulations. The statute puts no meaningful limit on the type, form, or style of "regulations" that the Secretary may prescribe—it is completely discretionary. The only

meaningful limit on the Secretary's power under § 322 is that the Secretary's regulations must "carry out the duties and powers of the Secretary." The Court can envision a situation where that provides a meaningful limit—for example, if a regulation exceeded the statutory authority endowed in the Secretary elsewhere in Chapter 49 of the U.S. Code. But that is not the case here. Polyweave does not contend the Secretary lacks power to rescind Subpart D. Nor could it: Subpart D outlines DOT enforcement procedures, a key part of the Secretary's power. Instead, Polyweave raises a straightforward arbitrary and capricious challenge, suggesting the Secretary provided insufficient reasoning to explain Subpart D's rescission. [DN 6-1 at 12–14]. The Court lacks any meaningful standard against which to judge the soundness of the Secretary's actions. This implies the Secretary's action is an unreviewable act committed to agency discretion.

More compelling, however, is the second reason why this Court finds Subpart D's rescission is an unreviewable agency action: courts typically consider this an area "traditionally committed to agency discretion." *Weyerhaeuser*, 139 S. Ct. at 370. Admittedly, rescinding published regulations is not an area traditionally committed to agency discretion. *See State Farm*, 463 U.S. at 41–42 (exercising arbitrary and capricious review over the rescission of a DOT regulation). But a quick look to the *substance* of the rescinded regulations confirms this is exactly the sort of area traditionally committed to agency discretion: internal guidelines and procedures. The rescinded regulations all involved DOT guidelines and procedures for enforcement actions, in a subpart titled "Enforcement Procedures." For example, the rescinded regulations urged DOT investigators to immediately disclose reasons for investigation to private parties, 49 C.F.R. § 5.61 (rescinded), required "clear legal foundations" for any resulting enforcement action, *id*. at § 5.63 (rescinded), and defined the types of bias or conflict of interest that disqualify investigators, *id*.

§ 5.73 (rescinded). From start to finish, the regulations detailed DOT's enforcement priorities, policies, and guidelines.

If a statute required DOT to promulgate these enforcement procedures, Polyweave would have an independent basis to challenge it. *Cf.* 5 U.S.C. § 556(d) (statutory requiring certain standards in administrative hearings, including a requiring that an administrative order must be supported by "reliable, probative, and substantial evidence"). But no statute requires promulgation of the enforcement procedures found in Subpart D. Instead, DOT provided these procedures in its discretion. It thus has the power to rescind access to these procedures in its discretion. The Court lacks power to step in and hold DOT to its discretionary decisions about which enforcement procedures it must provide to the public. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.").

These DOT enforcement procedures are closely tied to the prototypical type of unreviewable agency action: the decision not to institute enforcement proceedings. *Heckler*, 470 U.S. at 831–33. In *Heckler*, the Supreme Court determined the FDA's decision not to enforce a regulation against states using certain drugs in lethal injections was an unreviewable agency decision. *Id*. at 827. The Court recognized "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," including likelihood of success, use of agency resources, and "whether the particular enforcement action requested best fits the agency's overall policies." *Id*. at 831. All these factors rendered agency decisions not to institute proceedings a poor fit for judicial review.

Here, comparatively, DOT's policies simply outline the factors leading to those enforcement/nonenforcement decisions. For example, § 5.67 directly requires the agency to review enforcement actions "for legal sufficiency under applicable statutes and regulations." 49 C.F.R. § 5.67 (rescinded). Section 5.65 requires enforcement actions to not rely on *Chevron* deference as an "excuse for straining the limits of a statutory grant of enforcement authority." *Id.* at § 5.65 (rescinded). And § 5.85 prevents noncompliance with guidance documents "as a basis for proving violations of applicable law." *Id.* at § 5.85 (rescinded). DOT attorneys, when making enforcement decisions, look to these type of guidelines to determine "whether the particular enforcement action . . . best fits the agency's overall priorities," given limited resources. *See Heckler*, 470 U.S. at 831. Thus, these agency enforcement policies, like the enforcement/nonenforcement decisions they create, are a matter "peculiarly within its expertise." *See Heckler*, 470 U.S. at 831.

The enforcement procedures published in Subpart D are simply normal agency enforcement priorities and guidelines. DOT confirmed as much when it first published Subpart D: "The final rule describes the Department's *existing internal procedures* . . . for initiating and conducting enforcement proceedings." 84 Fed. Reg. 71714, 71716 (Dec. 27, 2019) (emphasis added). The only difference is that, with Subpart D, the Secretary decided to broadcast those procedures to the public in the Code of Federal Regulations. Then, fifteen months later, the Secretary decided not to broadcast those procedures any longer. The Court has "no meaningful standard" to judge the Secretary's decision whether to publish DOT enforcement procedures.

The Secretary's rescission of DOT's enforcement procedures from the Code of Federal Regulations is an unreviewable agency decision outside the scope of the APA. Polyweave has not established a likelihood of success on its substantive claims because the Court lacks jurisdiction to consider the agency's action.

### ii.     Review of Agency Process: Notice & Comment Rulemaking

Although the Secretary's rescission of Subpart D is *substantively* an unreviewable agency decision, that does not insulate the Secretary's decision from *procedural* judicial review.[7] *See Make the Road N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020) ("Even when a decision is committed to agency discretion by law, and so is immune from substantive review, the agency's decision may still be subject to notice-and-comment rulemaking."). So, the Court now turns to Polyweave's procedural contention that Subpart D's rescission needed to go through notice-and-comment rulemaking.

The APA generally requires notice-and-comment rulemaking. 5 U.S.C. §§ 554(b), (c). The notice-and-comment rulemaking requirement does not apply, however, "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id*. at § 553(b)(A). The Secretary rescinded Subpart D without notice-and-comment rulemaking—he stated that "this final rule revises only internal processes applicable to the Department's administrative procedures," so notice-and-comment rulemaking was not required. 86 Fed. Reg. 17292, 17293 (Apr. 2, 2021). Polyweave contends this decision was improper, because Subpart D was a "substantive" rule requiring notice and comment. [DN 6-1 at 9–11]; *see Am. Federation of Labor & Congress of Indus. Orgs. v. Nat'l Labor Relations Board*, 466 F. Supp. 3d 68, 88–90 (D.D.C. 2020) (delineating between "substantive" rules, which require notice-and-comment rulemaking, and "interpretive" rules, which do not).

---

[7] Mindful that it is stepping into murky waters of administrative law, the Court follows D.C. Circuit precedent. But the Court notes some tension between these precedents and the APA's text. Chapter 7 of the APA does not apply to "any agency action" that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (stating that "[t]his chapter applies…except to the extent that…agency action is committed to agency discretion by law"). So, presumably, a finding that agency action is "committed to agency discretion by law" means that Chapter 7 of the APA does not apply at all. But notice-and-comment rulemaking review (like arbitrary and capricious review) is an APA Chapter 7 requirement. *See* 5 U.S.C. § 706(2)(D) (requiring a court to hold unlawful agency actions found to be "without observance of procedure required by law"). So, actions "committed to agency discretion" would presumably be exempt from notice-and-comment rulemaking review, as well.

Polyweave's contention that Subpart D's rescission required notice-and-comment rulemaking, however, runs into one insurmountable hurdle: DOT enacted Subpart D without notice-and-comment rulemaking. When DOT promulgated Subpart D in December 2019, the agency stated that "this final rule merely incorporates existing internal procedures applicable to the Department's administrative procedures into the Code of Federal Regulations," rendering notice and comment unnecessary. 84 Fed. Reg. 71714, 71716 (Dec. 27, 2019). And § 551 of the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first place." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015); 5 U.S.C. § 551(5); *see Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) (calling it "black-letter administrative law" that an agency must use the same procedure to revoke a rule that it used to promulgate the rule). Thus, for the Court to determine that Subpart D's repeal required notice-and-comment rulemaking, it would need to find that Subpart D's promulgation required notice-and-comment rulemaking.

Now, perhaps the DOT was wrong both times. Perhaps it needed to promulgate and rescind Subpart D through notice and comment. But that would mean only that Subpart D was unlawful in the first place. And were the Court to grant Polyweave's requested remedy and reinstate Subpart D, the Court would be ordering Subpart D's reinstatement. It makes little sense to reinstate an unlawful regulation. The Court does "not see how a government action that illegally never went through notice and comment gains the same status as a properly promulgated rule such that notice and comment is required to withdraw it." *Friends of Animals*, 961 F.3d at 1206. Polyweave is unlikely to succeed on its claim that Subpart D's rescission required notice-and-comment rulemaking.

### B.  Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis omitted). The irreparable harm requirement is a necessary but not sufficient element for a preliminary injunction: "even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *D.T. v. Sumner Cnty. Schools*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc*., 679 F.2d 100, 105 (6th Cir. 1982)).

Polyweave asserts it will suffer irreparable injury absent an injunction because it will lose an array of due process and procedural rights. [DN 6-1 at 17–19]; *see* 49 C.F.R. § 5.83 (exculpatory information as a matter of course); *id*. at § 5.71 (prohibiting "adversarial personnel" who investigated and prosecuted an enforcement action from "furnish[ing] ex parte advice or factual materials to decisional personnel"); *id*. at § 5.85 (preventing DOT enforcement personnel from "us[ing] noncompliance with guidance documents as a basis for proving violations of applicable law"); *id*. at § 5.97 (encouraging DOT enforcement penalties to "reflect due regard for fairness, the scale of the violation, the violator's knowledge and intent, and any mitigating factors"). But these arguments also fall flat.

Despite Polyweave's best attempts to analogize, there is no constitutional right to any of the procedures formerly codified in Subpart D. *See Brodie v. Dep't of Health & Human Servs*., 951 F. Supp. 2d 108, 118–19 (D.D.C. 2013) ("*Brady* does not apply in the context of administrative hearings." (quotation omitted)). And even if there was, Polyweave has no evidence PHMSA is violating any of these rights in the underlying agency proceeding. For the same reasons that doomed Polyweave's standing arguments, it is unlikely that Polyweave is suffering any ongoing

irreparable injury. Its claims of injury are far too speculative for the Court to determine irreparable injury is "likely" in the absence of an injunction. *See D.T.*, 942 F.3d at 327.

***

If Polyweave had established Article III standing, the Court would deny its motion for a preliminary injunction because it would not establish (a) likelihood of success on the merits or (b) irreparable harm. Because neither factor supports Polyweave's claims, the Court need not consider the last two factors: substantial harm or public interest. *D.T.*, 942 F.3d at 327 (stating that, because irreparable injury is a necessary element of a preliminary injunction, a district court need not consider other factors after determining there was no irreparable injury).

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [DN 17] is **GRANTED**. Plaintiff's Motion for Preliminary Injunction [DN 6] is **DENIED**.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge

United States District Court

September 1, 2021

cc:     Counsel of Record